# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE G. TAPIA,<br><br>                              Petitioner,<br><br>v.<br><br>T. CISNEROS, Warden,<br><br>                              Respondent. | Case No.: 22cv283-LL-NLS<br><br>**ORDER DENYING FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A LIMITED CERTIFICATE OF APPEALABILITY** |

Presently before the Court is a First Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 by Jamie G. Tapia, a state prisoner proceeding pro se. ECF No. 8. Respondent has filed an Answer and a Notice of Lodgment of the state court record. ECF Nos. 15, 16. Petitioner has not filed a Traverse.[1]

## I.    BACKGROUND

A jury found Petitioner guilty of kidnapping, carjacking, kidnapping during a carjacking, assault with a firearm, corporal injury to a spouse and/or a person with whom he had a dating relationship, carrying a loaded firearm with intent to commit a felony, and

---

[1] Although this case was referred to United States Magistrate Judge Nita L. Stormes pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for the disposition of this matter. *See* S.D. Cal. CivLR 71.1(d).

two counts of making a criminal threat. ECF No. 16-2 at 294-302. The jury also found true allegations Petitioner personally and intentionally used a firearm. *Id*. He was sentenced to an indeterminate term of seven years to life plus ten years and a determinate term of four years and four months in prison. *Id*. at 309-10.

Petitioner appealed, raising three claims, two of which are presented here. ECF No. 16-19. The appellate court granted relief on a claim not raised here and vacated the kidnapping and carjacking convictions as lesser-included offenses of the kidnapping during a carjacking conviction, but denied relief on the merits of the claims brought here, that Petitioner's federal and state constitutional rights were violated by erroneous jury instructions (claim one) and by prosecutorial misconduct and ineffective assistance of trial counsel (claim two). ECF No. 16-22. A petition for review to the California Supreme Court raising those claims was summarily denied. ECF Nos. 16-23; 16-24.

Respondent answers that federal habeas relief is unavailable because claim one is not cognizable, claim two is procedurally defaulted, the state court adjudication of both claims is objectively reasonable, and any errors are harmless. ECF No. 15.

## II. TRIAL PROCEEDINGS

The following statement of facts is taken from the appellate court opinion on direct appeal. The Court defers to state court findings of fact and presumes they are correct. *Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

> Tapia met I.A. in April 2018. [Footnote: Out of respect for her privacy, we refer to Tapia's victim by the initials used by the Attorney General on appeal.] After several months of friendship, the relationship became romantic. The budding romance was immediately unstable, fraught with arguments, and later, violence. Tapia was jealous and repeatedly accused I.A. of cheating on him and being promiscuous. Despite the verbal and physical abuse, I.A. remained in the relationship because she wanted to help Tapia overcome his substance abuse.

> Tapia owned two guns, a revolver and a gun I.A. described as an "Uzi." On multiple occasions, Tapia would point the guns at I.A. or threaten to shoot her. He would also hit and choke her. He twice slashed the tires on her car with a knife.

In a particularly violent incident in early November 2018, Tapia accused I.A. of cheating on him and began to pull her hair and punch her in the face. He put his "Uzi" against her stomach and pushed his revolver into her mouth. He then took the revolver out of her mouth, spun the revolver's cylinder, put the gun to her head, and pulled the trigger. Tapia continued to play his game of Russian roulette with I.A. by alternately holding the gun to his head and I.A.'s head. I.A. eventually escaped from the house barefoot and vowed to leave the relationship.

But Tapia continued to harass I.A. by sending her threatening text messages and stalking her. He called her a "disgusting whore" and threatened that he was "going to tear (her) to pieces." One morning, Tapia broke down I.A.'s door and searched her house while pointing his revolver at her head. He told her that if he ever found a man there, he would shoot that man and her. On another occasion, Tapia told I.A., "you will remember me when I fucking shoot you."

In subsequent days, I.A. allowed Tapia to borrow her car to go to a job interview. When I.A. went to retrieve the car, Tapia was angry. He forcibly pushed I.A. and verbally abused her. I.A. left and drove home, to the mobile home park where she was living with her younger brother. Tapia repeatedly called I.A.; when she eventually answered, he told her that he was coming to her home to "make a scene where you live."

I.A. feared Tapia may hurt her brother, so she left her home and drove to the entrance of the mobile home park to meet Tapia. When Tapia arrived, he ran at her "mad" and started to punch her. Tapia pushed I.A. into the passenger seat, sat in the driver's seat, and began hitting her in the face and leg with his revolver. Tapia ordered I.A. to start the car and he began to drive away, ignoring her pleas to get out.

Tapia warned I.A. that if she tried to escape, he would crash the car and kill them both. As Tapia drove toward his house, I.A. heard a "big loud thing" and Tapia yelled that he shot himself. Tapia's leg began to bleed profusely and I.A. asked, "Can I call the ambulance for you?" Tapia pulled over and allowed her to call 911. I.A. exited the car to call 911 and Tapia told her to throw the gun into the bushes. As I.A. called 911, Tapia drove away toward his house, leaving her behind.

Tapia arrived at his house and fell onto the street, where a neighbor rushed over to help and called 911. Tapia told a responding officer that he was

driving with a gun on his lap and accidently shot himself. Meanwhile, I.A. walked to Tapia's house and, when she arrived, told the officers about the abuse she suffered and requested an emergency protective order. Later, I.A. helped officers search for the gun, but they failed to locate it. I.A. returned the next day and found the gun. Officers took custody of the gun. It had three unexpended rounds and one expended round.

ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 3-5 (Cal. Ct. App. Mar. 1, 2021).

## III. PETITIONER'S CLAIMS

(1) Because the evidence at trial established Petitioner accidentally fired his gun, the failure of the trial court to modify a pattern jury instruction on the firearm use allegation and to give a pinpoint instruction on accident violated his state and federal constitutional rights to due process and trial by jury. ECF No. 8 at 6-11.

(2) The prosecutor committed misconduct by repeatedly referring to Petitioner as a "monster" during closing argument and appealing to the jurors' emotions by asking them to place themselves in the victim's position, and defense counsel was ineffective for failing to object, in violation of his Fifth, Sixth and Fourteenth Amendment rights to a fair trial, adequate representation and due process. *Id*. at 12-16.

## IV. DISCUSSION

### A. Claim One

Petitioner's jury was instructed that within the meaning of the firearm use allegation, "[s]omeone uses a firearm if he or she intentionally does any of the following: (1), displays the weapon in a menacing manner; or (2), hits someone with the firearm; or (3) fires the weapon." Reporter's Transcript ("RT") at 1447; Lodgment No. 16-12. Petitioner argues here, as he did in state court, that because evidence at trial established he accidentally rather than intentionally fired the gun, the failure of the trial court to grant his request to modify that instruction to remove the third option of finding the enhancement true based merely on a finding that he "fire[d] the weapon," or to instruct the jury that a defendant is not guilty of a crime if he acted "without the intent required for that crime, but acted instead accidentally," violated his state and federal constitutional rights to due process and trial by

4

jury because it allowed the jury to find the enhancement true based on an accidental firing of the weapon rather than an intentional discharge, and thereby relieved the prosecution of its burden of proving beyond a reasonable doubt he intentionally fire the weapon. ECF No. 8 at 6-11. Respondent answers that: (1) the component of claim one which relies on an error of state law is not cognizable on federal habeas because the alleged error did not render the trial fundamentally unfair as necessary to constitute a federal constitutional violation, and (2) even assuming a federal constitutional violation occurred habeas relief is not warranted because the state court's denial of the claim is neither contrary to, nor an unreasonable application of, clearly established federal law, nor based on an unreasonable determination of the facts, and the error is harmless. ECF No. 15-1 at 12-15.

In order to obtain federal habeas relief with respect to a claim which was adjudicated on the merits in state court, a federal habeas petitioner must first demonstrate that the state court adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). If Petitioner can satisfy either provision, or they do not apply, a de novo review is required to determine whether a federal constitutional violation has been established. *Hardy v. Chappell*, 849 F.3d 803, 820 (9th Cir. 2016); *see also Fry v. Pliler*, 551 U.S. 112, 119-22 (2007) (holding that § 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."). Even then, a federal habeas petitioner is ordinarily not entitled to relief if the constitutional error is harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that a federal constitutional error in a state criminal trial is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict.).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially

indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id*. at 407. Under § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

The Court applies the provisions of 28 U.S.C. § 2254(d) to the last reasoned state court decision. *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). In this case that is the appellate court opinion on direct appeal, which stated:

> Tapia contends the trial court failed to properly instruct the jury regarding the firearm use allegations under section 12022.5, subdivision (a) and section 12022.53, subdivision (b). Tapia argues the evidence established he accidentally, rather than intentionally, fired the gun and, thus, the trial court should have (1) modified the pattern instruction to remove the option of finding the enhancement true based on the discharge of a firearm and (2) granted his request for a pinpoint instruction on accident. We disagree.
>
> A. *CALCRIM No. 3146*
>
> Both sections 12022.5, subdivision (a), and 12022.53, subdivision (b), apply when a person "personally uses a firearm" in the commission of a felony. The trial court instructed the jury on both allegations with CALCRIM

No. 3146. The pattern instruction explains that "(s)omeone *personally uses* a firearm if he or she *intentionally* does any of the following: (¶) 1. Displays the weapon in a menacing manner; (¶) 2. Hits someone with the weapon; OR (¶) 3. Fires the weapon." (CALCRIM No. 3146.) (Second italics added.)

Defense counsel asked the trial court to remove the third possibility of "fires the weapon" from the instruction because "(t)he evidence appears to be that when the defendant discharged the firearm he either did it accidentally or he was trying to kill himself." Defense counsel argued CALCRIM No. 3146, unmodified, "allows the *mere firing of a weapon*, period, to be sufficient evidence." (Italics added.) The prosecutor responded he would not be asking the jury to find the allegations true based on the theory that Tapia intentionally fired the weapon, but objected to removing that option because the prosecution's focus on other circumstances to establish the allegations "does not take away the possibility that the jury could believe that the discharge . . . was intentional and not an accident." The court denied the request to modify CALCRIM No. 3146.

"'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights.' (Citation.) We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular instruction." (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

"It is error to instruct a jury on a theory of guilt without evidentiary support, but the trial court must instruct the jury on every theory that is supported by substantial evidence. (Citations.) Substantial evidence is evidence that would allow a reasonable jury to find the existence of the facts underlying the instruction, and to find the defendant guilty beyond a reasonable doubt based on the theory of guilt set forth in the instruction. (Citations.) In making this determination, we view the evidence most favorably to the judgment presuming the existence of every fact that reasonably may be deduced from the record in support of the judgment. There is no instructional error when the record contains substantial evidence in support of a guilty verdict on the basis of the challenged theory." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290.) "'Errors in jury instructions are questions of law, which we review de novo.'" (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642.)

Tapia makes two related, yet distinct, claims regarding the trial court's alleged error in declining to modify CALCRIM No. 3146. First, he argues the instruction "misled the jury by failing to explain that the element of intending to discharge meant intentionally pulling the trigger in order to discharge or fire the weapon." We do not agree. By its plain language, the instruction required the jury to find Tapia "*intentionally* . . . (f)ire(d) the (weapon)," not a "mere firing of a weapon." (Italics added.) Moreover, the jury was instructed with CALCRIM No. 252 that to find the firearm use allegations true, Tapia "must not only commit the prohibited act, but must do so with wrongful intent." CALCRIM No. 252 further explained that Tapia "acts with wrongful intent when he . . . *intentionally* does a prohibited act." (Italics added.)

When considering the instructions given as a whole, we assume that jurors are "'"'intelligent persons and capable of understanding and correlating all jury instructions which are given.' (Citation.)"' (Citations.)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148.) Here, the instructions adequately instructed the jury that it could find the firearm enhancement true only if (as an alternative to the other manners of personal use of a firearm not at issue here) it concluded that Tapia fired his weapon *and did so intentionally*. We conclude the jury was not misled.

Second, Tapia argues the instruction should have been modified because "(t)here was no evidence Tapia intentionally tried to shoot the victim or himself, but shot himself instead." The evidence at trial, however, suggests otherwise. I.A. testified that after Tapia shot himself in the leg, "he wanted to shot (sic) himself again in the head." In her 911 call, which was introduced at trial, I.A. told the dispatcher that Tapia "*wanted* to shoot himself." (Italics added.) At trial, I.A. repeatedly confirmed that she made this statement. Additionally, an expert testified the gun is a single action revolver, which requires a person to manually cock the hammer in order to fire the weapon. If the trigger was accidently pulled, the gun would not fire unless the person first cocked the hammer. This expert opinion evidence supports an inference that Tapia's firing of the weapon was not the result of an accidental slip of the finger. Although the jury could reasonably find that Tapia accidentally fired the gun, it could also find that he intended to fire the gun.

While not a major theory at trial, there was sufficient evidence to support the conclusion that Tapia intentionally fired the gun. Defense counsel conceded this fact at trial, noting "the evidence appears to be that when the defendant discharged the firearm he either did it accidentally *or he was trying to kill himself*." (Italics added.) [Footnote: Tapia does not explain how "trying

to kill himself" would not be an intentional act.] The trial court correctly declined to modify CALCRIM No. 3146.

B. *CALCRIM No. 3404*

Tapia further contends the trial court erred when it denied his request to instruct the jury on accident. CALCRIM No. 3404 explains that a defendant is not guilty of a charged crime if he acted "without the intent required for that crime, but acted instead accidentally." The instruction is derived from the statutory defense in Penal Code section 26, that all persons are capable of committing crimes except, among other classes of persons, those "who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." The California Supreme Court has noted the defenses codified at section 26 "'have historical significance, (but) are now unnecessary restatements, in a defense format, of the requirements of the definitional elements of an offense.'" (*People v. Anderson* (2011) 51 Cal.4th 989, 997 (*Anderson*).)

In other words, accident is not an affirmative defense; it is a theory that attempts to negate the element of criminal intent. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199, fn. 3.) Thus, "(a) trial court's responsibility to instruct on accident . . . generally extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*Anderson, supra,* 51 Cal.4th at p. 997.) However, "'a trial court need not give a pinpoint instruction if it is argumentative (citation), merely duplicates other instructions (citation), or is not supported by substantial evidence (citation).'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.)

We conclude the trial court did not err in declining to give CALCRIM No. 3404 because the instruction merely duplicates the other jury instructions that were properly given on the factual question posed. As we have already explained, CALCRIM No. 3146 and CALCRIM No. 252 adequately instructed the jury that it could find the firearm enhancement true on the basis of a discharge only if it concluded that Tapia fired his weapon *and did so intentionally*.

For these same reasons, Tapia's claim that the alleged error violated his state and federal constitutional rights lacks merit. "Under established law, instructional error relieving the prosecution of the burden of proving beyond

a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479-480.) Because CALCRIM No. 3404 was entirely duplicative of the other jury instructions, its absence did not deprive the jury of instructions on every essential element of the firearm enhancement or otherwise lessen the prosecution's burden at trial.

Thus, even if we assume that the trial court erred in denying the requested pinpoint instruction, we review a trial court's decision to not give a requested pinpoint instruction under the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818. Tapia must show that it is "reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to a ( ) different conclusion in this case." (*People v. Earp* (1999) 20 Cal.4th 826, 887; see also *People v. Larsen* (2012) 205 Cal.App.4th 810, 830-831.) Tapia has failed to make that showing. As we have already explained, the jury was properly instructed on the requirement that the prosecution prove Tapia personally and *intentionally* fired the firearm.

Moreover, the theory that Tapia intentionally fired the firearm was not a central theory at trial such that any instructional error on that factual question likely had no effect on the jury's deliberations. Instead, during closing argument, the prosecution focused on the alternative manners for establishing Tapia's personal use of a firearm, based on evidence that Tapia intentionally displayed the firearm in a menacing manner and repeatedly hit I.A. with the firearm. I.A.'s testimony, when considered along with other evidence of Tapia's guilt, established beyond a reasonable doubt that Tapia personally used a firearm in those manners. Considering the record as a whole, we conclude the effect of CALCRIM No. 3404 on the jury's deliberations would have been insignificant such that it is not reasonably probable the jury would have reached a different result if it had been instructed differently. Tapia suffered no prejudice by the trial court's refusal to give a duplicative pinpoint instruction.

ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 5-11.

Respondent correctly observes that federal habeas corpus relief does not lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus does not lie for errors of state law.' . . . [And] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether

a conviction violated the Constitution, laws, or treaties of the United States.") (citation omitted). However, a claim of instructional error in a state criminal trial may raise to the level of a cognizable federal habeas claim if the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," or where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id*. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Because Petitioner's federal constitutional claim was adjudicated on the merits in state court, as a precondition to obtaining federal habeas relief he must show that the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Respondent argues that there is no clearly established federal law finding that a state court's refusal to modify a pattern jury instruction or give a duplicative pinpoint instruction violated federal due process or the right to a jury trial as claimed by Petitioner. ECF No. 15-1 at 13, citing *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (holding that clearly established law refers to those holdings that "squarely address[]" the issue presented.); *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (quotation omitted).

The Supreme Court, in addressing what constitutes clearly established federal law in the context of review of a grant of habeas relief by a district court which found "ample

evidence that the jury was confused about what elements had to be established in order for [petitioner] to be found guilty" beyond a reasonable doubt, stated:

> Our habeas precedent places an "especially heavy" burden on a defendant who, like [petitioner], seeks to show constitutional error from a jury instruction that quotes a state statute. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Even if there is some "ambiguity, inconsistency, or deficiency" in the instruction, such an error does not necessarily constitute a due process violation. *Middleton* [*v. McNeil*, 541 U.S. 436, 437 (2004)]. Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. *Estelle*, *supra*, at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). In making this determination, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, *supra*, at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Because it is not enough that there is some "slight *possibility*" that the jury misapplied the instruction, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), the pertinent question "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, *supra*, at 72 (quoting *Cupp*, *supra*, at 147).

*Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009).

Here, the state appellate court found the refusal to give the requested accident instruction or modify the pattern instruction did not rise to the level of a state or federal constitutional error because the accident instruction was "entirely duplicative of the other jury instructions" which, like the pattern instruction, accurately informed the jury they could only find the firearm use allegation true if the prosecution proved beyond a reasonable doubt that Petitioner fired his weapon intentionally. ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 9-10. Thus, consistent with, *Sarausad*, the appellate court found Petitioner did not show the instructions were ambiguous or that when considered in the context of the entire trial there was a reasonable likelihood the jury applied them in a way that relieved the prosecution of the burden of proof that he discharged his weapon intentionally. This Court need not determine whether the clearly established federal law identified in *Sarausad* "squarely addresses" the issue presented here so as to constitute

clearly established federal law under 28 U.S.C. § 2254(d). Assuming it does, the state court adjudication is objectively reasonable within the meaning of that law for two reasons. First, as the state court correctly found, the instructions unambiguously informed the jury that the prosecution has the burden of proof beyond a reasonable doubt that Petitioner intentionally fired his weapon. Second, even assuming the instructions were ambiguous on that point, a review of the record shows that the state court reasonably found there is no reasonable likelihood the jury applied their instructions in a way that allowed them to find the firearm use allegation true without requiring the prosecution to satisfy its burden of proof that the discharge was intentional.

The jury was instructed that "[s]omeone uses a firearm if he or she intentionally does any of the following: (1), displays the weapon in a menacing manner; or (2), hits someone with the firearm; or (3) fires the weapon. [¶] The People have the burden of proving each allegation beyond a reasonable doubt." RT at 1447. The prosecutor argued in closing that the firearm use allegation could be proven by the victim's testimony that she saw the gun when Petitioner hit her with it and Petitioner's own statement to the police that he shot himself while the gun was laying in his lap. RT at 1486-88. Defense counsel then replied in closing:

> We can conclude, I believe, that when Mr. Tapia approached her car he certainly did not brandish the firearm. Because if he had done that, why would she let him in the car? I think we can reasonably conclude that. If he was coming at her in the car, and he was brandishing a firearm, no matter what weaknesses or imperfections she might have, I'm pretty sure she would not have invited him into the car. I think that's the reasonable conclusion.

> He has guns all the time, apparently. And we have an old revolver that only requires two and a half pounds of trigger pull. It can be fired easily by merely moving the hammer to the rear with no external safety. It is the kind of weapon, if a person is irresponsible, that can easily be discharged accidentally.

> No matter which version you believe may or may happen, or which version you are trying to believe might have occurred, she did not allege that he pointed the gun at her, stuck the gun at her. One of her stories she does say

13

he struck her with it, that's true. And then another story she says she never saw it. So the jury has to resolve that in a presumption of innocence case, reasonable doubt.

RT at 1500. The prosecutor did not address the gun use enhancement in rebuttal.

Even assuming there was evidence Petitioner accidently shot himself as argued by defense counsel, there was also evidence from which the jury could draw a reasonable inference he intentionally fired his weapon. This included testimony from a criminalist with the firearm unit of the San Diego Sheriff's Department that the gun was a single-action revolver designed not to fire unless its hammer was manually cocked first and then the trigger pulled with at least two and a quarter pounds of pressure. RT at 1326-29. Evidence that Petitioner was suicidal allowed the jury to draw a reasonable inference he intentionally fired the gun, including testimony of the victim that: "when we were on freeway 5 he says, 'If you move, wave your hand, or ask for help I'm going to crash this car into another car we both are going to die'" RT at 970, and that she told the police Petitioner "thought he was dying and he wanted to shot [sic] himself again in the head." RT at 973. There was testimony from a responding officer that: "Based on what [Petitioner] was telling me it sounded like he wanted to harm himself." RT at 1173.

Thus, because there was evidence from which the jury could reasonably infer Petitioner intentionally fired his weapon, and because the jury was allowed to consider defense counsel's argument that the evidence showed the discharge was accidental and that the victim gave inconsistent and unreliable testimony as to the other two elements of the firearm use allegation, even assuming the instructions were ambiguous on the third element, there is no "reasonable likelihood" the jury applied their instructions in a way that rendered his trial fundamentally unfair. *See Estelle*, 502 U.S. at 72 ("[I]n reviewing an ambiguous instruction [which allegedly allowed the jury to find guilt despite a lack of proper evidence], we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."), quoting *Boyde*, 494 U.S. at 380 ("We think the proper inquiry in such a case is whether there is a

reasonable likelihood that the jury has applied [an ambiguous instruction subject to an erroneous interpretation] in a way that prevents the consideration of constitutionally relevant evidence.") Petitioner has not carried his burden under the contrary to clause of § 2254(d)(1) by proving that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102; *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof."). Neither has he satisfied the unreasonable application clause of § 2254(d)(1). *See Williams*, 529 U.S. at 407 (holding that a state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."). And because the state court adjudication finds support in the trial record, Petitioner has not shown it involved an objectively unreasonable determination of the facts within the meaning of § 2254(d)(2). *Miller-El*, 537 U.S. at 340.

Respondent also argues that even if § 2254(d) could be satisfied, any federal constitutional error is harmless. State court jury instructional errors are subject to harmless error analysis in federal habeas courts "so long as the error at issue does not categorically vitiat(e) all the jury's findings." *Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008) (internal quotation omitted). Such errors are harmless unless they can be shown to have had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637.

As quoted above, the state appellate court found that no federal constitutional error occurred because the alleged instructional error did not lessen the prosecution's burden of proof, but even assuming there was an instructional error it was harmless under the standard of *People v. Watson*, 46 Cal. 2d 818 (1956), because it was not "reasonably probable" the jury would have come to a different conclusion if they had been instructed in the manner

requested by the defense. The appellate court found that because the instructions correctly stated that "(s)omeone *personally uses* a firearm if he or she *intentionally* does any of the following: (¶) 1. Displays the weapon in a menacing manner; (¶) 2. Hits someone with the weapon; OR (¶) 3. Fires the weapon," and because the evidence at trial easily established the first two elements beyond a reasonable doubt, any error giving rise to an ambiguity with respect to the third element was harmless because any effect on the jury's deliberations "would have been insignificant" since whether he "intentionally fired the firearm was not a central theory at trial," and therefore "it is not reasonably probable the jury would have reached a different result if it had been instructed differently." ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 10-11.

Although the state appellate court found no federal constitutional error, the application of the *Watson* harmless error standard is an indication it applied harmless error analysis to a hypothetical state law error and not to any possible federal error. *See Hall v. Haws*, 861 F.3d 977, 989 n.7 (9th Cir. 2017) ("The *Watson* [reasonable probability] standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent [beyond a reasonable doubt] standard, under *Chapman v. California*, [386 U.S. 18 (1967)] is used to review errors of constitutional magnitude.") As a result, this Court independently applies the *Brecht* harmless error analysis to determine if any federal constitutional error was harmless. *See Fry*, 551 U.S. at 117-20 (holding that a federal habeas court applies *Brecht* where the state court failed to apply *Chapman*).

The evidence at trial easily established beyond a reasonable doubt the first two elements of the firearm use allegation, that Petitioner intentionally displayed his weapon in a menacing manner and intentionally hit the victim with it. That evidence included the victim's testimony that she did not see the gun when Petitioner approached her car but "he pushed me and moved me inside of the car. And he start [sic] beating me up with his hands and the gun inside." RT at 954. She testified that he hit her in the face with the gun, [RT at 967], and that she "noticed that he was holding a gun" when he hit her in the thigh with it which caused so much pain in her legs she could not sleep for days [RT at 969, 980]. The

victim identified at trial photographs taken of her body the next day which she testified showed purple bruises "like Jell-o, like rotten meat" on her leg and hip where Petitioner hit her with the gun, which got worse and lasted six months RT at 989-90), and showed an open cut from being hit by the gun "so hard that he broke my skin though my clothes" which left a mark still visible at the time of trial. RT at 991-92. As previously noted, Petitioner admitted to a responding officer that he was driving with the gun in his lap. In light of that evidence, any instructional ambiguity as to whether the jury was required to find Petitioner accidentally or intentionally discharged his weapon did not have had a substantial and injurious effect or influence in determining a verdict on the firearm use enhancement. *Brecht*, 507 U.S. at 637.

The Court denies habeas relief with respect to claim one because the state court adjudication is objectively reasonable under 28 U.S.C. § 2254(d), and even if that provision could be satisfied any federal constitutional error is harmless.

## B.    Claim Two

Petitioner alleges in claim two that (1) the prosecutor committed misconduct during closing argument by repeatedly referring to him as a "monster" and appealing to the jurors' emotions by asking them to place themselves in the victim's position, and (2) defense counsel was ineffective for failing to object. ECF No. 8 at 12-16. Respondent answers that the prosecutorial misconduct aspect of the claim is procedurally defaulted by defense counsel's failure to object, the state court adjudication of that claim is objectively reasonable within the meaning of § 2254(d), any error is harmless, and defense counsel was not ineffective for failing to raise a meritless objection. ECF No. 15-1 at 16-20.

The Court applies § 2254(d) to the appellate court opinion, which stated:

> Tapia faults the prosecutor with committing misconduct during closing argument. He contends that the prosecutor improperly referred to him repeatedly as a "monster" and appealed to the jurors' emotions by asking the jurors to place themselves in the victim's position. Considering the totality of the prosecutor's closing argument and Tapia's failure to object, we see no error.

## A.    *Prosecutor's Closing Argument*

The prosecutor began his argument by defining a "monster" as "(s)omeone that knows a person's weaknesses and uses those weaknesses against them, someone that causes harm, knows they're causing harm, but continues to cause that harm. Someone that's angry, someone that's physical. Someone that's violent. That's what a monster is." The prosecutor then applied that definition to Tapia and argued, "*The defendant, Jaime Tapia, was (I.A.)'s monster*." (Italics added.) On appeal, Tapia highlights five other times the prosecutor used the word "monster" to describe Tapia.

Tapia's counsel did not object to the prosecutor's use of the term "monster" in closing argument. "As a general rule, '"(a) defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."'" (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) However, "'(a) defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'" (*Ibid*.) Tapia makes that claim here. "He bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*Ibid*.)

Tapia fails to demonstrate any deficient performance by his counsel for failing to object because the record does not disclose any misconduct warranting an objection. Although he cites several decisions in which a court expresses disapproval of epithets or name-calling, each of those decisions notes that the prosecutor's conduct did not rise to the level of prejudicial misconduct. (See, e.g., *Darden v. Wainwright* (1986) 477 U.S. 168, 179 (prosecutor's closing argument "deserves the condemnation it has received" but did not deprive defendant of a fair trial); *People v. McDermott* (2002) 28 Cal.4th 946, 1002 (noting that the Supreme Court does not "condone the use of opprobrious terms in argument, but such epithets are not necessarily misconduct when they are reasonably warranted by the evidence").)

Instead of liberally finding prosecutorial misconduct on the basis of colorful or strong language in closing argument, the California Supreme Court has routinely held that prosecutors may permissibly use a "'wide range of

descriptive comment and the use of epithets which are reasonably warranted by the evidence.'" (*People v. Farnam* (2002) 28 Cal.4th 107, 168 (*Farnam*); *People v. Harrison* (2005) 35 Cal.4th 208, 245-246 (multiple uses of epithets and referring to defendant as "evil" was within the permissible scope of closing argument).) In light of the evidence of Tapia's violent conduct targeted at I.A., the prosecutor's use of the term "monster" to describe Tapia fell within the permissible scope of closing argument.

In asserting otherwise, Tapia relies on a recent decision of this court, *People v. Arredondo* (2018) 21 Cal.App.5th 493 (*Arredondo*), in which we held that the prosecutor's misconduct during closing argument warranted reversal of the defendants' convictions. In Arredondo, the prosecutor repeatedly referred to the defendants as "cockroaches," which Tapia likens to the prosecutor's use of the term "monster" in this proceeding. (*Id*. at pp. 502-503.) *Arredondo* is entirely distinguishable.

First, we carefully noted in *Arredondo* that the "problem with the prosecutor's use of the cockroach epithet . . . is not that it plainly denigrated and dehumanized defendants." (*Arredondo*, *supra*, 21 Cal.App.5th at p. 504.) Instead, we held that the prosecutor committed misconduct by referring to the defendants and other "cockroaches" like them as a "disgusting group which poses an ongoing threat to the entire community" rather than individuals to be judged on their own actions. (*Ibid*.) It was this notion of guilt by association that we held was improper, not the use of the dehumanizing epithet. (*Ibid*.) Second, we held the misconduct was harmless in most respects and prejudicial only when applied to the allegation that the defendants committed murder for the benefit of a street gang given the prosecutor's improper theme of collective guilt. (*Id*. at p. 506.) Collective guilt is not at issue in this case. Accordingly, our holding in *Arredondo* has no bearing on the issues raised in this appeal.

We conclude from our review of the record that the prosecutor's use of the term "monster" to describe Tapia was within the permissible scope of closing argument. Moreover, even if we assume the argument was improper and Tapia's counsel was ineffective for failing to object, we cannot conclude that if defense counsel had objected, it is reasonably probable the jury would have reached a more favorable verdict. The evidence of Tapia's guilt was overwhelming. It is not likely that the jury reached its verdict due to inflamed passion or prejudice based on the prosecutor's references to Tapia as a "monster."

/ / /

### B. *Prosecutor's Rebuttal Argument*

Tapia also asserts the prosecutor erred in his rebuttal argument when he responded to an argument of defense counsel by asking the jury to place themselves in the position of I.A. when deliberating. During his closing argument, Tapia's counsel asked the jury to consider if they would like being "dragged into a court of law with a flag and a judge and a prosecutor and spectators and a jury, and how would you like it if you were alleged to have done wrong, and they're making the case against you with (I.A.)?"

In response, the prosecutor asked the jury to apply "that same line of analysis" when considering I.A.'s credibility. The prosecutor asked the jury: "How would you feel if someone dragged you into court and they asked you -- let's just say it's a sexual assault case and they asked you to describe the last time you had sex with your partner. Or, like (I.A.), you're put on the stand and you're asked can you tell us about that time that he shoved a gun in your mouth . . . . How would you feel if you had to do that? (¶) If you think (I.A.)'s a liar, she sure had some interesting stories and made up a lot of stuff for you to believe." Tapia argues this statement improperly appealed to the jurors' emotions by asking them to stand in I.A.'s place when deliberating. [Footnote: Tapia's counsel did not object to this line of argument at trial and the issue is therefore forfeited. On appeal, however, Tapia asks this court to consider whether his trial counsel was ineffective for failing to object. We consider the claim in that context.]

A prosecutor's "appeal to the jury to view the crime through the eyes of the victim is misconduct . . . ." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057.) "'(I)t is generally improper to ask jurors to step into the victim's shoes and imagine his or her suffering.'" (*Farnam*, *supra*, 28 Cal.4th at p. 168.) However, "(t)here are situations in which the prosecutor has been allowed to make comments in rebuttal that would otherwise be improper, when such comments are fairly responsive to the argument of defense counsel." (*People v. Sandoval* (1992) 4 Cal.4th 155, 193.) Here, the prosecutor's rebuttal argument was in direct response to defense counsel's argument. By asking the jury to step into Tapia's shoes, defense counsel invited the rebuttal argument from the prosecution to, likewise, consider I.A.'s circumstances.

The prosecutor's argument, however, was distinct from arguments that have been found to be an improper appeal to the jury's emotions. We find the Supreme Court's decision in *People v. Lopez* (2008) 42 Cal.4th 960 (*Lopez*) particularly instructive. In *Lopez*, the defendant was a Catholic priest charged

with committing a range of sexual offenses on several teenage boys, who testified at trial regarding the defendant's actions. (*Id*. at pp. 963-965.) During closing argument, the prosecutor told the jury she expected defense counsel to argue the victims were not credible because they could not remember certain details during their trial testimony. (*Id*. at p. 968.) To defend their credibility, the prosecutor asked the jurors to "'(p)ut yourself in that situation'" and consider whether they would remember precise details four years later. (*Id*. at pp. 968-969.) Regarding another witness, the prosecutor asked the jurors to consider whether the witness's description of a room was credible by imagining a hypothetical in which they visited a bedroom and had to describe it later. (*Id*. at p. 969.)

The Court of Appeal in *Lopez* concluded the prosecutor committed misconduct in the closing argument by "'asking the jurors to stand in the shoes of the victim witnesses.'" (*Lopez*, *supra*, 42 Cal.4th at p. 969.) The Supreme Court, however, disagreed and reversed the appellate court. Although it recognized the general rule that a prosecutor may not invite the jury to view the case through the victim's eyes, the Supreme Court reasoned that the prosecutor's closing argument did not ask the jury to do so. "Rather, she gave two hypotheticals in which the victims did not at all figure." (*Id*. at p. 970.) In those hypotheticals, the prosecutor asked the jurors to place themselves in situations similar to those experienced by the victims to consider how well they would remember details of an incident or the particular features of a room if they were testifying years later. (*Ibid*.) The Supreme Court explained that the prosecutor's argument was not improper because "(i)n neither scenario did the prosecutor ask the jurors to stand in the shoes of the victims, so as to evoke jury sympathy for the victims." (*Ibid*.)

Although not precisely analogous, the closing argument at issue in *Lopez* bears striking similarity to the prosecutor's argument here. The prosecutor asked the jury to consider how it would feel to be "dragged" into court to testify about a hypothetical traumatic incident when judging whether I.A. was likely to have fabricated the incidents only to subject herself to the difficult trial process. Like the argument in *Lopez*, the prosecutor was not attempting to evoke sympathy for the victim or asking the jurors to view the crime from I.A.'s perspective, but rather asking the jury to judge I.A.'s credibility based on their own understanding of reasonable human behavior in difficult circumstances like those experienced by I.A. As the Supreme Court explained in *Lopez*, such argument is not misconduct.

/ / /

1
2
3
4
5
6
7

But even assuming the prosecutor's comment was improper and Tapia's counsel was ineffective in failing to object, we find that any error was harmless. Tapia must show that, but for his counsel's alleged error in failing to object, there is a reasonable probability the jury would have reached a different verdict. (*Centeno*, *supra*, 60 Cal.4th at p. 676.) The prosecutor's comment, suggesting that the jurors place themselves in a hypothetical situation like I.A.'s situation, was brief and not a central theme of his rebuttal. Given the overwhelming evidence of Tapia's guilt, it is unlikely this brief comment led the jury to reach its guilty verdict. Accordingly, Tapia's claim of prejudicial error lacks merit.

8

ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 11-17.

9

### 1. Procedural Default

10

Respondent first contends the prosecutorial misconduct aspect of claim two is

11
12
13

procedurally defaulted because it was denied by the state appellate court under California's contemporaneous objection rule which precludes raising claims on appeal which are forfeited by lack of objection at trial. ECF No. 15-1 at 16-17. As quoted above, the state

14
15
16

appellate court found the prosecutorial misconduct aspect of claim two procedurally barred by defense counsel's failure to object at trial, but then denied the claim on the merits after finding the prosecutor's comments were within the permissible scope of closing argument.

17
18
19

As Respondent correctly points out, the fact that the state court addressed the merits of the claim in addition to finding it procedurally barred does not prevent the claim from being procedurally defaulted in this Court. *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir.

20
21
22
23

2015). The state court did not find the ineffective assistance of counsel aspect of the claim to be procedurally barred but addressed its merits and found Petitioner had not established ineffective assistance of trial counsel because there was no reasonable probability the jury would have reached a more favorable verdict if counsel had objected.

24
25
26
27
28

In order to preclude federal habeas review based on a procedural default, a state procedural bar must rest on a state ground which is "independent" of federal law and "adequate" to bar federal review. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). To be "independent" the state law basis for the decision must not be interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983). To be "adequate," the state procedural

bar must be "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. Bean*, 96 F.3d 1126, 1129 (9th Cir. 1996).

Respondent has the initial burden of pleading as an affirmative defense that a failure to satisfy a state procedural rule forecloses federal review. *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). If Respondent is successful, the burden shifts to Petitioner to challenge the independence or adequacy of the procedural bar. *Id.* If Petitioner satisfies that burden, the ultimate burden falls on Respondent. *Id*.

The Ninth Circuit has recognized California's contemporaneous objection rule as an adequate and independent state procedural rule. *See Zapata*, 788 F.3d at 1110-12 (California contemporaneous objection rule is an adequate and independent state ground that barred federal habeas review of prosecutorial misconduct claim arising from the use of "several despicable, inflammatory ethnic slurs" against defendant to which defense counsel did not object). Respondent has therefore carried the initial burden which has shifted to Petitioner, which he may satisfy "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure." *Bennett*, 322 F.3d at 586. Because Petitioner had made no effort to carry that burden, the Court finds the prosecutorial misconduct aspect of claim two is procedurally defaulted.

The Court can address the merits of a procedurally defaulted claim if Petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or if a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim. *Coleman*, 501 U.S. at 750; *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (holding that a showing of fundamental unfairness needed to overcome a procedural default requires a presentation of "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial."). Petitioner argues that his trial counsel's failure to object to the prosecutor's improper remarks should provide for federal habeas relief if the prosecutorial misconduct claim itself is defaulted by the failure to object. ECF No. 8 at 12. Respondent argues Petitioner has not shown cause and prejudice to excuse the default, and that he cannot rely on a claim of ineffective assistance of trial

counsel to do so because such a claim must rise to the level of a constitutional violation itself to excuse the default and his claim of ineffective assistance of trial counsel based on a failure to object is without merit. ECF No. 15-1 at 17.

If Petitioner can establish that he received constitutionally ineffective assistance of counsel by counsel's failure to object at trial, he may be able to establish cause to excuse the default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (noting that although the Supreme Court has "not identified with precision exactly what constitutes 'cause' to excuse a procedural default, [it has] acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice."), citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). As set forth below in the discussion of the merits of Petitioner's ineffective assistance of counsel claim, he is unable to show constitutionally inadequate representation by trial counsel in failing to object, and therefore cannot overcome the cause requirement on that basis. However, because the ineffective assistance claim is intertwined with the merits of the misconduct claim and they both fail on the merits, the Court will address the merits of both claims and deny relief on the merits without addressing whether Petitioner can establish cause and prejudice or a fundamental miscarriage of justice. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits . . . , so it may well make sense in some instances to proceed to the merits if the result will be the same.")

### 2.    Merits

In order to prevail on a claim of prosecutorial misconduct, a federal habeas petitioner must demonstrate that "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Alleged instances of misconduct must be reviewed "in the context of the entire trial." *Donnelly*, 416 U.S. at 639; *see also Greer v. Miller*, 483 U.S. 756, 765-66 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result

in the denial of the defendant's right to a fair trial.") (quotation omitted). This is because "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Petitioner argues here, as in state court, that the prosecutor committed misconduct by: (1) referring to him as a monster seven times during closing argument in a reprehensible effort to dehumanize him to the jurors, and (2) asking the jurors how they would feel if they were the victim to inflame their passions with an appeal for sympathy. ECF No. 8 at 12-16. As noted by the appellate court, the prosecutor in *Darden* referred to the defendant as an "animal" and "made several offensive comments reflecting an emotional reaction to the case." *Darden*, 477 U.S. at 179-80. The Supreme Court found the trial was not rendered fundamentally unfair by that improper argument because the jury was instructed their decision was required to be based on the evidence and that argument of counsel was not evidence, and because the heavy weight of the evidence against the defendant reduced any likelihood of an influence on the jury's decision. *Id*. at 181-82.

As in *Darden*, the jury here was instructed their decision must be based on the evidence and that argument of counsel is not evidence. The trial judge told the jury during their initial instructions that: "As I mentioned during voir dire -- and I will mention probably on several occasions throughout the trial -- please remember at all times that the attorneys are not witnesses. Since it is your duty to decide the case solely on the evidence which you see or hear in this case, you cannot consider as evidence any statement of any attorney made during trial." RT at 664. The judge began the final instructions by stating: "It is up to all of you and you alone to decide what happened based only on the evidence as has been presented to you in this trial." RT at 1424. Immediately before the attorneys began their closing argument, the judge instructed the jury: "you have heard all the evidence. Now time to hear the argument of counsel. Once again, perhaps the last time: Remember that nothing the attorneys say is evidence. Each attorney will outline for you his interpretation as to what the evidence has shown." RT at 1456.

As the appellate court noted, the use of the term "monster" to describe Petitioner constituted a description of Petitioner's conduct toward the victim, which included, as previously noted, hitting her with his gun so hard it cut her skin through her clothes and left a mark still visible at trial as well as grotesque bruises which lasted for six months, and terrorizing her by driving a car with a gun in his lap and threatening to kill them both by steering into an oncoming car. The appellate court noted that, prior to the actions which resulted in Petitioner's conviction here, he had repaid the victim's devoted efforts to help him overcome his substance abuse by hitting and choking her, pointing guns at her and threatening to shoot her, and slashed her tires twice. ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 3. The appellate court went one to describe Petitioner's behavior:

> In a particularly violent incident in early November 2018, Tapia accused I.A. of cheating on him and began to pull her hair and punch her in the face. He put his "Uzi" against her stomach and pushed his revolver into her mouth. He then took the revolver out of her mouth, spun the revolver's cylinder, put the gun to her head, and pulled the trigger. Tapia continued to play his game of Russian roulette with I.A. by alternately holding the gun to his head and I.A.'s head. I.A. eventually escaped from the house barefoot and vowed to leave the relationship. [¶] But Tapia continued to harass I.A. by sending her threatening text messages and stalking her. He called her a "disgusting whore" and threatened that he was "going to tear (her) to pieces." One morning, Tapia broke down I.A.'s door and searched her house while pointing his revolver at her head. He told her that if he ever found a man there, he would shoot that man and her. On another occasion, Tapia told I.A., "you will remember me when I fucking shoot you."

*Id*. at 3-4.

The appellate court's determination that "[i]n light of the evidence of Tapia's violent conduct targeted at I.A., the prosecutor's use of the term 'monster' to describe Tapia fell with the permissible scope of closing argument," *id*. at 13, and that even if it was misconduct it did not deprive Petitioner of a fair trial within the meaning of *Darden* because the "evidence of Tapia's guilt was overwhelming," *id*. at 12, is neither contrary to, nor an unreasonable application of, clearly established federal law. *See Darden*, 477 U.S. at 181 (requiring a showing that the prosecutorial misconduct "so infected the trial with unfairness

as to make the resulting conviction a denial of due process."); *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) ("[U]nder *Darden*, the first issue is whether the prosecutor's remarks were improper and, if so, whether they infected the trial with unfairness."); *Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing *Darden* is clearly established federal law for AEDPA review purposes with respect to a prosecutor's improper comments). Neither is it based on an objectively unreasonable determination of the facts, as the appellate court's adjudication is supported by the record.

As to the second aspect of the misconduct claim, defense counsel argued in closing that the testimony of the victim was not credible, and then stated, "how would you like it if you were alleged to have done wrong, and they're making the case against you with [I.A.]?" RT at 1506. The prosecutor replied to that argument in rebuttal:

> And again, its up to you to determine her credibility. [¶] The defense also asks you to be fair and an impartial jury and of course that's your job. And they talked about how would you feel if you were dragged into court like [I.A] and everything relied on [I.A.]. Well, you can use that same line of analysis in determining [I.A.]'s credibility. [¶] How would you feel if someone dragged you into court and they asked you - - let's just say it's a sexual assault case and they asked you to describe the last time you had sex with your partner. Or, like [I.A.] you're put on the stand and you're asked can you tell us about that time that he shoved a gun in your mouth and you vomited and lied to him that you had to poop so you could leave; and then when you left you were running down the street using a jacket to shield yourself because you thought he was chasing you? How would you feel if you had to do that?

RT at 1512-13.

Thus, the prosecutor was responding to a defense attack on the credibility of the victim and to defense counsel asking the jurors whether they would feel comfortable being found guilty solely on the evidence of her testimony. The appellate court reasonably found that the prosecutor rebutted that argument by explaining to the jury it was understandable that someone could be confused or have inconsistencies in their testimony if they had to relive and reveal at trial what Petitioner had put them through and did not attempt to inflame the passion of the jurors by asking them to decide guilt or innocence by placing themselves

in the shoes of the victim. The appellate court's denial of this aspect of the prosecutorial misconduct claim on that basis is neither contrary to, nor an unreasonable application of, the clearly established federal law which provides that prosecutorial misconduct which, viewed in the context of the entire trial, does not rise to the level of a federal constitutional violation unless it results in a fundamentally unfair trial. *Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. at 639. This is particularly true in light of the appellate court's findings that the evidence against Petitioner was "overwhelming," the prosecutor's comment "was brief and not a central theme of his rebuttal," and was in direct rebuttal to the defense attack on the victim's credibility. *See Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010) (listing as *Darden* factors, "the weight of the evidence, the prominence of the comment in the context of the entire trial, . . . [and] whether the comment was invited by defense counsel in its summation.") And because the appellate court's reliance on the trial record is accurate, Petitioner has not carried his burden of showing the state court adjudication of the prosecutorial misconduct claim is objectively unreasonable within the meaning of 28 U.S.C. § 2254(d)(2).

Even assuming the misconduct rose to the level of a federal constitutional violation, federal habeas relief is not available unless such error is shown to have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002) ("If prosecutorial misconduct is established, and it was constitutional error, we then apply the *Brecht* harmless error test.") Given the overwhelming evidence of Petitioner's extremely abusive conduct toward the victim, calling him a "monster" as a comment on that evidence, and given defense counsel's attack on the credibility of the victim, briefly arguing in rebuttal that the jurors should consider if their testimony under such conditions would be free of inconsistences, did not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Finally, Petitioner claims he received ineffective assistance of counsel based on his trial counsel's failure to object to the prosecutor's comments. To show constitutionally

ineffective assistance of counsel, counsel's performance must have been deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's deficient performance must also have prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." *Id.* To establish prejudice, Petitioner must demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Petitioner must establish both deficient performance and prejudice. *Id.* at 687.

The appellate court denied the ineffective assistance of counsel aspect of claim two by finding, with respect to the "monster" comments, "we cannot conclude that if defense counsel had objected, it is reasonably probable the jury would have reached a more favorable verdict. The evidence of Tapia's guilt was overwhelming. It is not likely that the jury reached its verdict due to inflamed passion or prejudice based on the prosecutor's references to Tapia as a 'monster.'" ECF No. 16-22, *People v. Tapia*, D077113, slip op. at 14. With respect to the rebuttal argument, the appellate court found there was no "reasonable probability the jury would have reached a different verdict" because "the prosecutor's comment, suggesting that the jurors place themselves in a hypothetical situation like I.A.'s situation, was brief and not a central theme of his rebuttal. Given the overwhelming evidence of Tapia's guilt, it is unlikely this brief comment led the jury to reach its guilty verdict. *Id*. at 17.

Petitioner argues there could be no tactical reason for not objecting to the repeated references to him as a monster or to the prosecutor's urging the jurors to put themselves in the victim's place. ECF No. 8 at 14-15. Respondent answers that there can be no deficient performance in failing to raise a meritless objection, and there was no prejudice from the failure to object because there is no reasonable probability the jury would have reached a different result had an objection been made. ECF No. 15-1 at 17, 20.

The state appellate court's adjudication of the ineffective assistance of counsel aspect of claim two, on the basis there is no reasonable probability that the failure to object affected the jury's verdict, is neither contrary to nor an unreasonable application of *Strickland* because there is no reasonable probability the alleged misconduct affected the jury's verdict for the reasons discussed above. *Id.* at 694 (prejudice requires a showing of a reasonable probability that the result of the proceeding would have been different absent the error); *Richter*, 562 U.S. at 105 ("The standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when the two apply in tandem, review is 'doubly' so.") (citations omitted).

Even assuming Petitioner could satisfy § 2254(d), he has not shown constitutionally ineffective assistance of counsel because the unobjected to misconduct did not result in an unfair trial for the reasons discussed above. *See Richter*, 562 U.S. at 110 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting *Strickland*, 466 U.S. at 686. In addition, the *Strickland* standard is higher than the *Brecht* standard. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Thus, for the reasons set forth above why the *Brecht* standard was not satisfied by the misconduct, Petitioner is unable to satisfy the *Strickland* standard. *See Kipp v. Davis*, 971 F.3d 866, 878 (9th Cir. 2020) (petitioner necessarily did not satisfy *Strickland* standard where *Brecht* standard was not satisfied).

Habeas relief is denied with respect to the prosecutorial misconduct aspect of claim two on the basis that: (1) it is procedurally defaulted, (2) assuming Petitioner could overcome the default, the adjudication of the claim by the state court is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and (3) any federal constitutional error is harmless. Habeas relief is denied with respect to the ineffective assistance of counsel aspect of claim two on the basis that the adjudication of the claim by the state court is objectively reasonable within the meaning of 28 U.S.C. § 2254(d), and assuming that standard could be met, the claim fails on its merits.

/ / /

## V.  CERTIFICATE OF APPEALABILITY

The Court is required to grant or deny a Certificate of Appealability when entering a final order adjudicating a 28 U.S.C. § 2254 habeas petition. *See* Rule 11, rules foll. 28 U.S.C. § 2254.  "[T]he only question [in determining whether to grant a Certificate of Appealability] is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017), quoting *Miller-El*, 537 U.S. at 327. Under that standard, because defense counsel did not object to statements by the prosecutor of the type which courts have recognized as improper, the Court finds that the issues involved in claim two are adequate to deserve encouragement to proceed further, and that a Certificate of Appealability is appropriate limited to claim two. *See Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (en banc) (the standard for granting a certificate of appealability is lower than that for granting habeas relief, and a court must resolve doubts whether a certificate should issue in the petitioner's favor).

## VI.  CONCLUSION AND ORDER

Based on the foregoing, the First Amended Petition for a Writ of Habeas Corpus ECF No. 8 is **DENIED** and the Court **ISSUES** a Certificate of Appealability limited to claim two of the First Amended Petition. The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED**.

Dated:  May 19, 2023

_____
Honorable Linda Lopez
United States District Judge